Matter of Kohn v County of Sullivan (2023 NY Slip Op 01123)

Matter of Kohn v County of Sullivan

2023 NY Slip Op 01123

Decided on March 2, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:March 2, 2023

535241
[*1]In the Matter of Burt Kohn, Petitioner,
v
County of Sullivan, Respondent.

Calendar Date:January 12, 2023

Before:Garry, P.J., Egan Jr., Lynch, Pritzker and McShan, JJ.

Sussman and Associates, Goshen (Michael H. Sussman of counsel), for petitioner.
Michael McGuire, County Attorney, Monticello (Khalid Bashjawish of counsel), for respondent.

Lynch, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Sullivan County) to review a determination of respondent terminating petitioner's employment.
Petitioner was the administrator of the Sullivan County Adult Care Center (hereinafter ACC) — a County-based nursing home — between October 2020 and October 2021. In July 2021, petitioner was notified pursuant to Civil Service Law § 75 that he was being charged with 11 counts of misconduct and one count of incompetence due to alleged violations of respondent's code of conduct and ethics policy. These charges were amended in August 2021 to include additional allegations against petitioner. Petitioner answered and denied the charges.
Following a disciplinary hearing, a Hearing Officer found petitioner guilty of eight charges and recommended that he be dismissed from service. The Commissioner of respondent's Division of Health and Family Services (hereinafter the Commissioner) sustained the Hearing Officer's findings with respect to seven charges and terminated petitioner's employment. Petitioner commenced this CPLR article 78 proceeding challenging the determination, and the proceeding was transferred to this Court (see CPLR 7804 [g]).
"Pursuant to Civil Service Law § 75 (1), a civil service employee 'shall not be removed or otherwise subjected to any disciplinary penalty except for incompetency or misconduct shown after a hearing upon stated charges' " (Matter of Blahmah v New York Off. of the State Comptroller, 207 AD3d 905, 906 [3d Dept 2022] [ellipsis and citation omitted], quoting Matter of Scuderi-Hunter v County of Delaware, 202 AD3d 1309, 1314 [3d Dept 2022], lv denied 39 NY3d 903 [2022]). " 'The standard of review of such a determination made after a disciplinary hearing is whether it is supported by substantial evidence' " (Matter of Blahmah v New York Off. of the State Comptroller, 207 AD3d at 906, quoting Matter of Scuderi-Hunter v County of Delaware, 202 AD3d at 1314). This is " 'a minimal standard that requires less than [a] preponderance of the evidence and demands only the existence of a rational basis in the record as a whole to support the findings upon which the determination is based' " (Matter of Blahmah v New York Off. of the State Comptroller, 207 AD3d at 906, quoting Matter of Wales v City of Saratoga Springs, 200 AD3d 1262, 1264 [3d Dept 2021]).
The findings relative to charges Nos. 3, 4, 6 and 16 — which were sustained by the Commissioner — pertain to allegations that petitioner either suggested to or directed [FN1] a subordinate to share her login credentials for a database maintained by the Centers for Disease Control and Prevention (hereinafter CDC) with another employee to enable that employee to fulfill ACC's COVID-19 reporting requirements while the subordinate was on vacation. Respondent alleged that such behavior constituted misconduct in violation of its rules and ethics policy, and also displayed incompetence insofar [*2]as petitioner failed to recognize that his behavior could have resulted in ACC incurring penalties.
The record contains a copy of respondent's written code of conduct and a certification by petitioner, dated October 26, 2020, acknowledging receipt thereof. The code of conduct provided, in relevant part, that "[t]he County is committed to complying with the laws and regulations that govern the Federal and State programs that it administers. . . . [Employees] must abide by the policies and procedures and the standards set by the County." Correspondingly, respondent's ethics policy provided: "It is the policy of the County to observe all laws and regulations applicable to its business and to conduct business with the highest degree of integrity. To accomplish this, all [employees] must obey the laws and regulations that govern their work and always act in the best interest of the . . . County."
During the disciplinary hearing, Cynthia Hathaway, ACC's director of nursing, explained that ACC was required by law to log in to the CDC's National Health Safety Network (hereinafter NHSN) on a weekly basis to submit COVID-19 data. ACC could incur fines and penalties if it did not comply. By the spring of 2021, Hathaway was the only ACC employee who had the login privileges necessary to do the COVID-19 reporting, with petitioner having a lower level of access that did not grant him reporting privileges. Hathaway began the process of obtaining a higher-level access for both petitioner and Tara Hunt — the assistant director of nursing — in or around May 2021.
The record evidence generally confirms as much, containing a June 28, 2021 email from the CDC to petitioner inviting him to register with CDC's partner portal to begin the process of obtaining access to the NHSN database. The email advised that petitioner was being invited "based on [his] specific role in public health" and that online registration with the partner portal would "take[ ] about 5 minutes." The email further advised that the process of obtaining access to the NHSN database would require online registration, identity verification (if required) and access approval. Petitioner was provided with temporary login credentials to access the portal and was informed that the registration invite was valid for 30 days. During the hearing, Hathaway explained that the June 28 email was inviting petitioner to apply to get a "grid card," which, if approved, would grant him privileges to input data into the NHSN database.
On July 6, 2021, Hathaway sent an email to petitioner asking whether he had logged into the portal, advising that she would be on vacation from July 16 through July 27 and would not be able to report ACC's COVID-19 data during that time. Petitioner responded that he never logged on to the partner portal and was relying on Hunt to do the COVID-19 reporting in Hathaway's absence. In a reply email that same day, Hathaway informed petitioner that Hunt did not have access to the database, [*3]he should not rely on Hunt to have access by the time of her vacation, and he should have logged in to the CDC portal with the temporary login information he had received on June 28 to apply for his own access to the database. Hathaway testified that, rather than heeding such advice, petitioner suggested during a meeting on July 9 that Hathaway could "just give [her] login information to [Hunt] so she could log in to complete the surveys while [Hathaway] was on vacation." When Hathaway refused to share her login information — fearing that doing so would violate respondent's rules and amount to a crime — petitioner became angry and purportedly stated, "I don't know why everything is such a big deal here."
The rules of behavior governing the NHSN website, a copy of which was admitted into evidence during the hearing, specifically prohibited users from sharing accounts and passwords, stating that "[n]on-compliance will be addressed through sanctions imposed under existing policy and regulation." Hunt generally corroborated Hathaway's testimony about the July 9, 2021 meeting, testifying that petitioner suggested that she log in to the NHSN database using Hathaway's information. When Hathaway left the room after petitioner made this suggestion, petitioner asked Hunt why Hathaway was so upset, to which Hunt responded, "you asked us to, you know, break the law in regards to . . . reporting under someone else's credentials." Petitioner allegedly replied, "why is everyone so uptight here."
At the hearing, petitioner maintained that the COVID-19 reporting mandate was a clinical report, meaning that ACC's nursing unit was responsible for completing it. He was adamant that, rather than giving Hathaway an order to provide Hunt with her login credentials, he merely made a suggestion to that effect. According to petitioner, when Hunt explained why Hathaway was upset by his suggestion, he responded, "I'll work on it and see what I can do." Petitioner emphasized that this conversation took place on a Friday and that he promptly called the CDC the following Monday to obtain a grid card that would enable him to access the NHSN database. He was eventually granted a grid card after Hathaway went out on vacation; however, when he attempted to log in to NHSN on July 19, 2021, he could not gain proper access to complete the report. Although the report was due prior to July 27, petitioner was unable to complete it because he was charged with misconduct on July 20 and never returned to work.
As a threshold point, we agree with petitioner that the testimony established only that he made a suggestion to Hathaway to provide her login credentials for the NHSN database to Hunt, not that he directed her to do so. There is a meaningful distinction between a "directive" from a departmental commissioner to a subordinate and a "suggestion." As a matter of fundamental due process, findings in a disciplinary proceeding must be based on the charges made (see Matter of Kiyonaga v [*4]New York State Justice Ctr. for the Protection of People with Special Needs, 204 AD3d 1351, 1353 [3d Dept 2022]). To that end, we agree with petitioner that the determination sustaining charges Nos. 4 and 6 is not supported by substantial evidence and must be annulled.
We do, however, find that substantial evidence exists to support the Hearing Officer's determinations on charges Nos. 3 and 16. Petitioner received a copy of respondent's code of conduct upon his commencement of employment, which clearly stated that the County was "committed to complying with the laws and regulations that govern the Federal and State programs it administers." In turn, the rules governing the NHSN website expressly prohibited users from sharing privileged user accounts and passwords. Despite receiving an email on June 28, 2021 inviting him to register with CDC's partner portal to apply for access to the database, and being made aware as early as July 6, 2021 that Hathaway was going out on vacation and he could not rely on Hunt to do the COVID-19 reporting in her absence, petitioner continued to rely on Hunt having access to complete the report.
Although the record does not establish whether petitioner was provided with a copy of the rules governing the NHSN database, the June 28, 2021 CDC email indicated that obtaining access thereto was limited to individuals who were specifically invited to apply and required a multi-step verification process. In light of the foregoing, petitioner reasonably should have been aware that password sharing and reporting under someone else's credentials was prohibited under the CDC's rules. Indeed, Hunt — a subordinate — was aware of the state and federal restrictions surrounding NHSN access. Accordingly, the findings of misconduct under charge No. 3 should be sustained. Moreover, in light of the sensitivity of the information contained on the NHSN database and the verification process necessary to obtain reporting privileges, there is substantial evidence to support the determination on charge No. 16 that petitioner displayed incompetence by failing to recognize that his suggestion, if acted upon, exposed ACC to penalties.
Substantial evidence also supports the determinations relative to charges Nos. 8, 9 and 10. These charges pertain to three instances between March 2021 and May 2021 in which petitioner allegedly asked staff members to volunteer to test positive for COVID-19 to reduce visitation at ACC. Relevant to this issue, respondent's code of conduct required staff to conduct themselves in a professional manner, "exhibit the highest level of integrity in performing [their] job[s]," and "maintain a positive work environment through good working relationships with . . . co-workers." The record reveals that, during the COVID-19 pandemic, a dispute arose between petitioner and certain family members of ACC's residents regarding visitation at the facility, with petitioner taking the position that visitation should be limited to [*5]protect clients and staff members. To advance this position, several witnesses recounted that petitioner asked during staff meetings if any employee wanted to volunteer to test positive for COVID-19. During the hearing, petitioner acknowledged that he posed this question several times because the Department of Health had enacted a policy of restricting visitation at nursing homes upon the existence of confirmed COVID-19 cases. On at least one occasion, an employee told petitioner that she was hurt by his question because she knew people who had died from COVID-19. Petitioner maintained that he stopped asking this question after being made aware of the employee's discomfort. Petitioner's testimony that he asked this question as a joke, to "lighten the load," evinces remarkably poor judgment and a flippant disregard of the potential seriousness of contracting COVID-19, all the more so in a nursing home environment. It also had the potential to negatively impact staff. Accordingly, the findings relative to charges Nos. 8, 9 and 10 will not be disturbed.
We are unpersuaded by petitioner's contention that the penalty of termination shocks the conscience and should be annulled. We recognize that petitioner had no prior disciplinary record and a long career as a health care administrator. However, when considering petitioner's position as the administrator of a nursing home during the COVID-19 pandemic, which required the highest degree of integrity, diligence and competence in light of the vulnerability of ACC's clients and staff, we cannot conclude that the penalty of termination is " 'so disproportionate to the charged offenses as to shock one's sense of fairness' " (Matter of Scuderi-Hunter v County of Delaware, 202 AD3d at 1317, quoting Matter of Young v Village of Gouverneur, 145 AD3d 1285, 1287 [3d Dept 2016]). Accordingly, we will not disturb the penalty imposed.
Garry, P.J., Egan Jr., Pritzker and McShan, JJ., concur.
ADJUDGED that the determination is modified, without costs, by annulling so much thereof as sustained charges Nos. 4 and 6, and, as so modified, confirmed.

Footnotes

Footnote 1: The amended charge document alleged in charges Nos. 3, 4 and 6 that petitioner "directed" the subordinate to give her credentials to another employee; however, charge No. 3 was amended during the hearing to state that petitioner made a "suggestion" in this respect. No request was made to so amend charges Nos. 4 and 6. In his reply brief, petitioner raises no challenge to the mid-hearing amendment or claim that the Hearing Officer erred in permitting same (cf. Matter of Kiyonaga v New York State Justice Ctr. for the Protection of People with Special Needs, 204 AD3d 1351, 1353 [3d Dept 2022]).